ROADWAY EXPRESS, INC., APPELLANT, v.
DIRECTOR, DIVISION OF TAXATION, RESPONDENT

PILOT FREIGHT CARRIERS, INC., APPELLANT, v.
DIRECTOR, DIVISION OF TAXATION, RESPONDENT

Argued September 27 and October 10, 1966
Decided December 18, 1967.

472

*Mr. Nicholas Conover English* for appellants (*Messrs. McCarter & English,* attorneys).

*Mr. Alan B. Handler,* First Assistant Attorney General, for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

HALL, J. The question on these consolidated appeals is whether New Jersey may constitutionally impose its corporation business tax, *N. J. S. A.* 54:10A–1, *et seq.,* upon

motor freight trucking companies conducting an exclusively interstate business in the state, involving, however, substantial local activities and property. Appellants (taxpayers) contend that the case is on all fours with *Spector Motor Service, Inc. v. O'Connor*, 340 *U. S.* 602, 71 *S. Ct.* 508, 95 *L. Ed.* 573 (1951), which held that a state franchise tax for the privilege of doing business within the state could not be applied to such an enterprise by reason of the commerce clause of the United States Constitution, *Art.* I, *Sec.* 8, *cl.* 3. Respondent (Director) urges that the levy is valid as to the taxpayers because the basis of our tax is vitally different from that in the Connecticut statute involved in *Spector* and, in any event, subsequent decisions of the United States Supreme Court indicate a less rigid view of the constitutional propriety of subjecting interstate businesses, by means of state taxes of the type of New Jersey's corporation business levy, to their fair share of the costs of state government, in view of the protection and benefits they receive therefrom.

■ It goes without saying that we fully recognize we are bound by the holdings of the United States Supreme Court as to federal limitations on state taxation of interstate business in the absence of Congressional action. But that court over the years has varied considerably in its approaches in this field. As Mr. Justice Frankfurter commented in *Freeman v. Hewit*, 329 *U. S.* 249, 251–252, 67 *S. Ct.* 274, 276, 91 *L. Ed.* 265, 271 (1946):

"The power of the States to tax and the limitations upon that power imposed by the Commerce Clause have necessitated a long, continuous process of judicial adjustment. The need for such adjustment is inherent in· a federal government like ours, where the same transaction has aspects that may concern the interests and involve the authority of both the central government and the constituent States.

"The history of this problem is spread over hundreds of volumes of our Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially in this field opinions must be read

in the setting of the particular cases and as the product of preoccupation with their special facts."

Professor Hellerstein in his survey of the court's changing approaches contained in *State and Local Taxation, Cases and Materials* (*2nd Ed.* 1961), 158–168, puts it this way:

"The present posture of the Court is characteristic of its entire history in dealing with Commerce Clause tax issues—the great issues involved reflect sharp differences in approach among the Justices, the leading cases are decided by slim majorities over strong dissent, and both the rationale and holdings are fluid and dynamic, with one decade's minority becoming the next decade's majority, only to be displaced in another decade by a new majority." (At *p.* 164).

Our obligation is therefore that so well expressed by Judge Learned Hand in his dissenting opinion on an earlier phase of *Spector* in the Court of Appeals for the Second Circuit:

"* * * I conceive that the measure of [a lower court's] duty is to divine, as best it can, what would be the event of an appeal [to the United States Supreme Court] in the case before it." (*Spector Motor Service, Inc. v. Walsh*, 139 *F.* 2d 809, 823 (1944)).

The taxes involved are for the years 1946 to 1960, inclusive. The case is here for the second time with respect to appellant Roadway Express, Inc. (Roadway). It first sought to challenge constitutional applicability by an action in lieu of prerogative writ and for a declaratory judgment. This court affirmed the dismissal of the suit for failure to exhaust administrative remedies through appeal to the Division of Tax Appeals (Division). *Roadway Express, Inc. v. Kingsley*, 37 *N. J.* 136 (1962). Justice Jacobs pointed out that the nature of the challenge called "for careful examination of the true nature of the tax * * * and the detailed facts relating to the properties and activities of [Roadway] within New Jersey", dictating the taking of evidence and the making of factual findings and legal determinations in the first instance by "the administrative officials

designated by the Legislature for that purpose". (37 *N. J.*, at *p.* 140).

Thereafter the Director, in August 1962, made formal determinations of the taxes asserted to be due as to both taxpayers, who took appeals therefrom to the Division. (We are advised all the taxes so levied were paid under protest). That agency made full findings and conclusions in December 1965, holding the tax validly applicable to the taxpayers and affirming the Director's determinations. The taxpayers' appeals to the Appellate Division, *R. R.* 4:88-8(a), were certified on our own motion prior to argument there. *R. R.* 1:10-1.

The basic provision of the New Jersey corporation business tax, adopted by *L.* 1945, *c.* 162, reads as follows:

> *"Every domestic or foreign corporation* which is not hereinafter exempted shall pay an *annual franchise tax* for the year one thousand nine hundred and forty-six and each year thereafter, as hereinafter provided, *for the privilege of having or exercising its corporate franchise in this State, or for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State. And such franchise tax shall be in lieu of all other State, county or local taxation upon or measured by intangible personal property used in business by corporations liable to taxation under this act.* \* \* \*" *(N. J. S. A.* 54:10A-2). (Emphasis added).

The measure of the tax is allocated net worth (stockholders' book equity) plus, since *L.* 1958, *c.* 63, allocated net income (related to taxable income as reported to the federal government, with certain exceptions not here pertinent). *N. J. S. A.* 54:10A-4(d) and (k) and 5. Allocation in the case of multi-state activities, to determine the amount properly attributable to New Jersey, is computed, in the case of net worth, by application of the greater of either an assets allocation formula or a three-factor (Massachusetts) business allocation formula, and in the case of net income, by use of the business allocation formula. *N. J. S. A.* 54: 10A-5 and 6. The amount of the tax is fixed by applying specifed percentages to the allocated figures. As to net

worth, the quite nominal rate is, subject to certain minima, 2 mills per dollar on the first $100,000,000 (increased from 8/10 of a mill by L. 1954, c. 88), 4/10 of a mill on the second $100,000,000, 3/10 of a mill on the third $100,-000,000 and 2/10 of a mill on all amounts in excess thereof. As to net income, the rate is a flat 1¾%.[1] *N. J. S. A.* 54:10A–5 and 6. See *United States Steel Corporation v. Director, Division of Taxation*, 38 *N. J.* 533, pp. 539–540 (1962); *F. W. Woolworth Co. v. Director of Division of Taxation*, 45 *N. J.* 466, 473–475 pp. (1965).

It should be noted that the taxpayers do not contend that the tax here is discriminatory against interstate businesses or that it is an undue burden on interstate commerce. They do not challenge the allocation formulas as unfair as applied to an interstate business like theirs and do not suggest the result of the New Jersey tax is multiple taxation elsewhere. Indeed, they do not at all attack the amount of the taxes determined by the Director.

Turning to the detailed facts of the activities and properties of these taxpayers as developed before the Division, Roadway is a Delaware corporation, having its home office in Akron, Ohio. It succeeded to the business of an Ohio corporation of the same name in 1954. It is engaged in motor carriage of general commodities as a common carrier over a large section of the country, pursuant to certificates of convenience and necessity issued by the Interstate Commerce Commission. It has never been authorized, or made application to be authorized, by New Jersey to do business in this state. Conversely, there is nothing to show New Jersey has ever attempted to compel it to obtain such authority or sought to exclude it from carrying on its business here.[2]

---

[1] This has been raised to 3¼% by L. 1966, c. 134.

[2] In this connection it may be mentioned that Roadway had refused to file state tax returns prior to our earlier decision. 37 *N. J.* 136. The Director had previously proceeded against it, not by an effort to exclude it from the state by a suit for an injunction as the act

Roadway's operations in New Jersey have generally been of the same type during the years involved, although they have steadily expanded in size. Since the evidence below dealt mostly with the picture in 1960, our references will be to that year unless otherwise noted. In that year it maintained two terminals in the state serving the New York-New Jersey metropolitan area. The principal one was in Kearny (which in 1959 had replaced a generally similar facility in Hoboken), with a subsidiary one in Bound Brook (since moved to another location). It owned and operated two types of trucking vehicles. One was over-the-road tractor-trailers carrying truckload lots of goods to and from its New Jersey terminals from and to its terminals in other states, as well as, in some instances, direct delivery or pick-up at the customer's place of business. About 100 of these vehicles came into the Kearny terminal in an average week. They were "domiciled" elsewhere and not registered or licensed by New Jersey. The other type was the so-called city fleet of straight trucks, tractors and trailers, more than 60 in number, which were kept at Kearny and registered, licensed and inspected in New Jersey.

The city fleet vehicles picked up freight at a customer's place of business in New Jersey and other parts of the metropolitan area and brought it to the Kearny terminal, where it was unloaded on the dock and then reloaded on an over-the-road unit for shipment out of the state. An inbound shipment was handled in reverse order. The Bound Brook terminal had no dock facilities and freight to and from that depot usually moved in over-the-road truckload trucks, with less than truckload shipments being transported to Kearny for consolidation and interstate shipment from there. In addition, some customers delivered freight to the

authorizes (*N. J. S. A.* 54:10A–20), but by methods of collection of the taxes he assessed out of the corporation's property in the state pursuant to the state tax uniform procedure law, *N. J. S. A.* 54:48–1, *et seq.*

Kearny terminal by their own vehicles and picked up shipments to them there. In such cases the customer was given an allowance on the total freight charges, which were based on carriage from the shipper's place of business to that of the consignee.

It is clear that Roadway did not carry freight shipped by a customer located in New Jersey to a destination in the state. All the freight traffic with which the New Jersey terminals were concerned must be said to be interstate in character, despite the fact that some of it was temporarily interrupted in its journey at the Kearny terminal for unloading and reloading.

These New Jersey traffic activities were very substantial in total. In 1960 Roadway's over-the-road vehicles alone travelled over two and a half million miles on state, county and municipal highways here and the total mileage in New Jersey, with the city fleet trucks included, was estimated to have exceeded 11 million miles. In 1958 charges to shippers for freight originating in New Jersey amounted to slightly over $4,000,000 and similar charges for freight delivered here to almost $3,800,000. In 1960, out of total gross revenues from all points amounting to $71,380,000, $5,728,000 was derived from the New Jersey operations. Although the New Jersey figures include revenue from freight collected from or delivered to the whole metropolitan area, the greater portion of the freight originated in New Jersey and all of it was handled in New Jersey at some time during the shipment.

Equally substantial was the physical nature of the Kearny terminal and the personnel activity connected therewith. Roadway built the terminal in 1959 on a 13 acre plot it owned. The total investment was $941,120. There is a two-story office building containing 7,338 square feet of space, a one-story loading and unloading dock building 101 feet wide and 409 feet long, and a one-story service garage 60 feet wide and 99 feet long. Employed there under three management representatives were 6 dispatchers, 3 supervisors in

charge of 6 dock foremen who supervised 55 dock employees, an office manager, a claim supervisor and 48 clerical workers, 86 city fleet drivers, 6 garage employees, and a sales manager in charge of 5 salesmen. (The Bound Brook terminal was located on premises rented at $1800 per year and there were only 2 employees at that location).

The Kearny garage repaired and maintained the city fleet. It also serviced and made some repairs on over-the-road vehicles. Local business establishments made emergency major motor repairs to these vehicles on a contractual basis.

The Kearny sales staff was responsible for soliciting business in the entire metropolitan area, each salesman making 50 calls per week using leased passenger cars. The company also mailed flyers to customers, maintained listings in telephone directories in New York and parts of New Jersey and advertised in various trade journals.

Roadway maintained one account in a New Jersey bank. In 1958 the average amount on deposit there was $154,238, representing cash receipts collected in the state. This account was subject to withdrawal only by the home office. New Jersey employees were paid by check on an Akron bank and local purchases, which amounted in 1958 to over $250,000, were paid for by sight drafts issued by New Jersey office employees and accepted by the Akron bank.

Also of significant note is the fact that Roadway has used the New Jersey courts to enforce claims and defend claims against it. It apparently has never contended that it is not doing business in the state for purposes of valid service of process upon it and, again, it seemingly has not been excluded from bringing actions in the state courts as our statutes direct with respect to ordinary foreign corporations not authorized to do business in the state. *N. J. S. A.* 14:15–3 and 4.

Despite the localized nature of most of these activities, we assume for present purposes they are so intimately connected with the exclusively interstate freight business that, under

current law, they are not to be classified separately as intra-state in character for state taxation purposes.

In 1960 Roadway paid local property taxes on the Kearny terminal of $32,044, New Jersey "vehicle taxes" (presumably state registration fees for the city fleet vehicles) of $13,473, state taxes on motor fuel purchased in New Jersey of $23,907, "payroll taxes" (presumably the employer's share of unemployment compensation contributions for New Jersey employees) of $18,448 and other state or local taxes of $2,071, amounting in total to $89,943.

The record presented to us disclosed only the corporate business tax determined by the Director for 1960, which was in the amount of $7,334.50.

The business of appellant Pilot Freight Carriers, Inc. (Pilot) was conducted in a manner so similar to that of Roadway that an opposite result was not urged by reason of the few differences that did exist. The Division therefore did not make detailed findings as to it and held that its tax liability was controlled by the decision as to Roadway. It may be noted that Pilot, a North Carolina corporation based in Winston-Salem in that state, did register as a foreign corporation with the New Jersey Secretary of State. Its operations were somewhat smaller, both overall and in New Jersey. It leased its terminal in Moonachie from a closely related foreign corporation, which was licensed to do business in this state and has regularly paid corporation business tax here, and its vehicles were serviced and repaired at that location by another related corporation, likewise licensed and paying corporation business tax. The Director fixed Pilot's tax liability for 1960 at $266.70.

The nature of the New Jersey corporation business tax must next be considered. It cannot be doubted, as the taxpayers urge and the Director concedes, that the tax is a franchise, *i. e.*, a privilege, impost. The statute so designates it, *N. J. S. A.* 54:10A–2, the regulations (*Corporation Business Tax Regulations* (1959), *p.* 5) so describe it, and this court has so stated, albeit in contexts different than here

involved and without exploration of its nature and aspects beyond the limited concern in the particular case. *Werner Machine Co. v. Director of Division of Taxation,* 17 *N. J.* 121 (1954), affirmed 350 *U. S.* 492, 76 *S. Ct.* 534, 100 *L. Ed.* 634 (1956) ; *United States Steel Corporation v. Director, Division of Taxation, supra* (38 *N. J.* 533) ; *F. W. Woolworth Co. v. Director of Division of Taxation, supra* (45 *N. J.* 466).

In *Werner,* the plaintiff, a New Jersey corporation, contended that the tax, then measured only by net worth, was in essence a tax on the underlying property making up that value and so the tax base could not constitutionally include tax exempt United States government bonds owned by the corporation. It was in this context that we said the tax was not on property, but a *bona fide* annual excise "* * * for the privilege of exercise by the corporation of corporate powers in this State". (17 *N. J.,* at *pp.* 126–127). The United States Supreme Court, in affirming, accepted this conclusion and held the tax valid despite the inclusion of federal bonds in the determination of net worth. In *United States Steel,* the taxpayer was also a domestic corporation and the short discussion of the nature and history of the tax as a franchise levy (38 *N. J.,* at *pp.* 539–540) was set forth only as background to consideration of the question when corporate mergers took place within a certain tax year or years. *Woolworth* involved a New York corporation authorized to do business in New Jersey and engaged in retail store intrastate operations here. The issues were the proper base for computation of net worth and net income allocable to New Jersey and the matter of fair application of the allocation formulas. Our mention of the nature of the tax and the various provisions of the statute (45 *N. J.,* at *pp.* 473–475) was simply by way of introduction to consideration of those issues. No previous case in this court has had to be concerned with the current question of the constitutional applicability of the tax to a foreign corporation engaged solely in interstate commerce here or consid-

eration of the statutory provisions in relation to such a problem.

■ The basis of the tax is a broad one and is not, as the taxpayers contend, imposed merely or solely for the privilege of doing business in New Jersey. It is a state tax applying generally to all domestic and foreign corporations, except those exempted by *N. J. S. A.* 54:10A–3— primarily financial institutions and certain public utilities taxed specially by other acts. It was certainly intended to reach foreign corporations doing an intrastate business, an interstate business, or both, as far as could constitutionally be done, and its disjunctive recital of the various privileges must be considered with the intended overall coverage in mind. It was enacted in 1945 (*L.* 1945, *c.* 162), before Spector (and not amended since as far as the basis of the tax is concerned) and during the period when the approach of the United States Supreme Court may be said to have been that of the so-called multiple taxation doctrine. See Hellerstein, *supra,* at *pp.* 161–163. The privileges taxed, *N. J. S. A.* 54:10A–2, are stated, as we have indicated, in the alternative and are not confined, as was the Connecticut statute in *Spector,* to that "of carrying on or doing business within the state". (340 *U. S.,* at *p.* 603, *n.* 1, 71 *S. Ct.* 509, 95 *L. Ed.* 576). Thus the privilege taxed may also be either that of exercising its corporate franchise within the state, *or* of owning or employing capital or property in the state, *or* of maintaining an office in the state. The last two stated alternatives clearly point particularly to the nexus of localized activity within the state of a nature and extent, as here, where it can realistically be said that state government substantially affords protection and gives benefits to the corporation's enterprise within the state.

■ Perhaps even more significant is the express "in lieu" feature of the tax—"And such franchise tax shall be in lieu of all other State, county or local taxation upon or measured by intangible personal property used in business by corporations liable to taxation under this act". *N. J.*

*S. A.* 54:10A–2. A bit of history is important here. Under the New Jersey tax structure, generally speaking, taxes for municipal, school district and county needs are assessed and collected at the municipal level by an *ad valorem* levy at a local rate on real and personal property within the municipality. These entities further receive revenue by grants or other distributions from the state government which has become increasingly substantial. The state itself also has the power to tax the same property but it has not exercised it for many years. See *City of East Orange v. Palmer,* 47 *N. J.* 307, 317 (1966). Its revenues come almost exclusively from a variety of excises. New Jersey has never had a general direct corporate or personal income tax.

Until 1945 the local levy on personal property applied to both tangibles and intangibles of individuals and corporations, including foreign corporations doing business in the state. The statute as to the latter, *R. S.* 54:4–19, provided that they should "be assessed for the amount of capital usually employed in this state in the doing of such business, and not otherwise taxed as real property or tangible personal property", the assessment to be made in the municipality "where the business is most usually carried on and transacted". In addition, domestic corporations had long been subject to a franchise tax on their capital stock at the state level, *R. S.* 54:13–1 to 10, inclusive, and after 1937, foreign corporations doing business in the state were also subject to a similar impost, with a provision, as to corporations engaged in multi-state activities, for allocation of the total capital stock on the ratio of the gross income from the business done in the state to the total gross income from its entire business, *R. S.* 54:32A–1 to 53, inclusive. See *Corporation Business Tax Regulations* (1959), *p.* 5.

The situation which had developed by 1945 and which led to the adoption of the state corporation business tax by *L.* 1945, *c.* 162 (*N. J. S. A.* 54:10A–1, *et seq.*) is succinctly described in *United States Steel, supra* (38 *N. J.,* at *p.* 539):

"The Corporation Business Tax Act (1945) was adopted because of dissatisfaction with prior law under which intangible property was taxable *ad valorem* at the substantial rates applicable to realty and tangible personalty. While some owners of intangibles paid at negotiated rates or escaped taxation completely, others were suddenly selected for full taxation, a phenomenon which was dubbed 'tax lightning.' The Legislature accepted the recommendation in the *Report of the Commission on Taxation of Intangible Property* (1945), *p. xxii*, that the statute be adopted to supersede such taxation of intangibles and as well the then-existing capital stock tax act."

The statute specifically repealed the capital stock tax as to both domestic and foreign corporations, *N. J. S. A.* 54:10A–26, and another act, *L.* 1945, *c.* 163, adopted at the same time, expressly removed from the general tax law all provisions permitting taxation of intangible personal property, including *R. S.* 54:4–19.

The net income measure of the tax, as another element in addition to net worth, was inserted by *L.* 1958, *c.* 63, pursuant to the recommendation of the *Ninth Report of the Commission on State Tax Policy* (1958). The essential purpose was to provide an increase in the state's revenues. It may be surmised that historical antipathy in New Jersey to an income tax as such led to inclusion of it rather as another element of the franchise tax, although otherwise it has all the attributes of a direct levy on income. There seems to be no question that, if it had been enacted and denominated as a direct corporate income tax, it would have been validly applicable to the taxpayers here by virtue of *Northwestern States Portland Cement Co. v. State of Minnesota,* 358 *U. S.* 450, 79 *S. Ct.* 357, 3 *L. Ed. 2d* 421 (1959).

■■ We think it is also clear from the recent decisions of the United States Supreme Court that a state corporate tax may be properly applied to an exclusively interstate business though it be denominated a "franchise" tax. See Note, *Developments—State Taxation,* 75 *Harv. L. Rev.* 953, *pp.* 1031–1033 (1962). Constitutional propriety is not to be determined by labels or semantics, but rather by the operating incidence of the particular levy. While a tax basis worded as

is New Jersey's has never been passed upon by the nation's highest court, we earnestly believe that the current course of its opinions in the field, as we read them, points to the conclusion that this levy is valid as applied to exclusively interstate business.

Our review of these decisions begins, of course, with *Spector* (340 *U. S.* 602, 71 *S. Ct.* 508, 95 *L. Ed.* 573 (1951)). There the taxpayer conducted an exclusively interstate trucking business in Connecticut in a manner not significantly different from Roadway and Pilot. The taxing statute, previously quoted in significant part, had been construed by the Connecticut Supreme Court of Errors as imposing a tax, measured by allocated net income, on the franchises of domestic and foreign corporations solely for the privilege of carrying on business in the state. Though non-discriminatory as to interstate commerce, it was said the levy could not rest on any other basis and was not in lieu of any property tax. The majority, speaking through Mr. Justice Burton, held that, since the state court had determined the tax attached solely to the taxpayer's franchise to do interstate business, this "channel" through which Connecticut sought to make interstate commerce pay its way was an unconstitutional one. It specifically said, however, that "[t]he State is not precluded from imposing taxes upon other activities or aspects of this business which, unlike the privilege of doing interstate business, are subject to the sovereign power of the State." 340 *U. S.*, at *p.* 609, 71 *S. Ct.*, at *p.* 512, 95 *L. Ed.*, at *p.* 578.

Mr. Justice Clark, joined by Mr. Justice Black and Mr. Justice Douglas, dissented. He urged that the result represented a reinvigoration of old decisions long since enfeebled by later cases, that the majority had rested on a label and that the state had lost because of its failure to use the right tag. He pointed out that it seemed clear the majority would have sustained the tax if the state legislature or its highest court had described the levy as one for the use of highways or in lieu of an *ad valorem* property tax. He failed to see a proper constitutional distinction from the situation where, if

some of this taxpayer's same total Connecticut business had been intrastate, the same tax in the same amount would have been upheld. He felt strongly that exclusively interstate commerce could constitutionally be required to pay its way for the facilities and services of the state it necessarily used, that such business received adequate protection where the state levy was fairly apportioned and non-discriminatory, and that there was "no reasonable warrant for cloaking a purely verbal standard with constitutional dignity." 340 *U. S.*, at *p.* 614, 71 *S. Ct.*, at *p.* 515, 95 *L. Ed.*, at *p.* 581.

We have made these detailed references to the majority and dissenting points of view in *Spector* because we are convinced that the minority approach has since become the court's general view and that the later decisions demonstrate the case remains authority, at the very most, only in the precise statutory situation there found.

That progression of approach is well indicated by comparing *Railway Express Agency, Inc. v. Commonwealth of Virginia,* 347 *U. S.* 359, 74 *S. Ct.* 558, 98 *L. Ed.* 757 (1954) (*Railway Express I*) with *Railway Express Agency, Inc. v. Commonwealth of Virginia,* 358 *U. S.* 434, 79 *S. Ct.* 411, 3 *L. Ed. 2d* 450 (1959) (*Railway Express II*). In *Railway Express I,* the court struck down a portion of a Virginia tax statute applying only to express companies. The taxpayer was engaged solely in interstate business in the state. (It was a foreign corporation and under Virginia law such an entity could not exercise intrastate public service powers; a separate Virginia corporation had been organized to conduct its intrastate business). The statute provided for a state property tax on such companies levied on intangible personal property and money (to which no objection was made) and, "for the privilege of doing business in this State", in addition to the property tax, an "annual license tax" upon gross receipts earned in the state "on business passing through, into or out of this State." 347 *U. S.*, at *p.* 362, 74 *S. Ct.*, at *p.* 560, 98 *L. Ed.*, at *p.* 761. The majority of the court held that the license tax was no more than a privilege tax that,

like the one in *Spector,* could not be applied to an exclusively interstate business. Mr. Justice Clark, again in dissent but now joined by three other members of the court, stated he would uphold the tax on the same grounds he urged in *Spector,* as well as commenting that he thought the tax was acceptable even under the *Spector* rationale, since Virginia's highest court had construed the impost to be an *ad valorem* tax on intangible property.

Thereafter Virginia amended its express company taxing law and the new statute came before the court in *Railway Express II.* The tax was now denominated "a franchise tax which shall be in lieu of taxes upon all of its other intangible property and in lieu of property taxes on its rolling stock", measured by "the gross receipts derived from operations within" Virginia. 358 *U. S.,* at *p.* 438, 79 *S. Ct.,* at *p.* 414, 3 *L. Ed. 2d,* at *p.* 454. The tax was sustained and this time Mr. Justice Clark wrote the opinion joined in by six members of the court. One of the other three concurred in the result and the remaining two dissented. Stress was laid on the fact that the impost was no longer called a "license tax" laid on the privilege of doing business in Virginia and that it was not a condition precedent to engaging in interstate commerce in the state. The tax was found to be, in harmony with the state Supreme Court's view, one on the taxpayer's intangible property, *i. e.,* its "going concern" value. *Spector* was not mentioned in connection with the substantive features of the tax. Mr. Justice Brennan and Mr. Justice Harlan, in concurring opinions, expressed some reservation as to the property tax thesis. The former indicated the tax was also valid as a fairly apportioned, nondiscriminatory levy, consistent with the state's tax structure, requiring the interstate express company "only to pay its share." Mr. Justice Harlan thought the impost was entirely proper as an "in lieu" tax.

We think these two cases demonstrate that while a state, under a literal view of the *Spector* thesis, may not impose a tax upon interstate commerce solely for the privi-

lege of doing that business in a state, a franchise tax may be imposed thereupon if the incidence or basis is a privilege other than engaging in that business as such or when the levy is in lieu of other state taxes which could be validly imposed on exclusively interstate business.

The same day *Railway Express II* was decided, the court handed down its opinion in *Northwestern States Portland Cement Co. v. State of Minnesota, supra* (358 *U. S.* 450, 79 *S. Ct.* 357, 3 *L. Ed. 2d* 421) of which Mr. Justice Clark was also the author, joined in by five other members. Justices Frankfurter, Whittaker and Stewart dissented. (The opinion actually covered two separate cases from two different states, the other being *Williams v. Stockham Valves & Fittings, Inc.,* coming up from Georgia. The statutes, corporate activities and questions were substantially the same and so we will refer only to the Minnesota case). At issue was the validity of Minnesota's apportioned, nondiscriminatory direct income tax expressly levied on domestic and foreign corporations whose business within the state consisted exclusively of foreign or interstate commerce or both. The activities and physical connections in the state of the taxpayer, a foreign corporation, were somewhat minimal. It owned nothing therein except some furniture in a small office it rented as headquarters for a secretary and four salesmen, who solicited orders for cement throughout the state. The orders were accepted at the plant in Iowa and all shipments were made from that point directly to the Minnesota customers.

The tax was sustained. The importance of the decision in relation to the problem before us is in what we believe to be the underlying rationale and emphasis, indicating a broader view by a majority of the present court of the propriety of state taxation of interstate commerce than the rather rigid formalism found in *Spector* and *Railway Express I,* despite the fact that the tax involved here was an income and not a privilege tax. That thought is perhaps best expressed in this quotation from the opinion:

"\* \* \* The taxes are not regulations in any sense of that term. Admittedly they do not discriminate against nor subject either corporation to an undue burden. While it is true that a State may not erect a wall around its borders preventing commerce an entry, it is axiomatic that the founders did not intend to immunize such commerce from carrying its fair share of the costs of the state government in return for the benefits it derives from within the State. The levies are not privilege taxes based on the right to carry on business in the taxing State. The States are left to collect only through ordinary means. The tax, therefore, is 'not open to the objection that it compels the company to pay for the privilege of engaging in interstate commerce.' Underwood Typewriter Co. v. Chamberlain, supra (254 U. S. 113, at 119, 41 S. Ct. 45, at 46, 65 L. Ed. 165), \* \* \*" (358 *U. S.*, at *pp.* 461–462, 79 *S. Ct.*, at *p.* 364, 3 *L. Ed. 2d*, at *p.* 429).

The court expressly spoke of *Spector* as not requiring a contrary result because the tax there was imposed for the privilege of doing interstate business within the state, meaning to us, in the light of the overall philosophy of the opinion, that that case is to be confined to its exact situation.[3]

The final recent case to be mentioned is *General Motors Corp. v. Washington,* 377 *U. S.* 436, 84 *S. Ct.* 1564, 12 *L. Ed. 2d* 430 (1964), where the opinion was also written by Mr. Justice Clark for a five member majority. The decision appears to have bearing on the issue here, not because of its facts, which are complex and differ considerably from those at bar, but rather, again, by reason of the underlying ap-

---

[3] Shortly after the decision in *Northwestern Cement,* Congress passed *P. L.* 86–272 (1959), 73 *Stat.* 555, 15 *U. S. C. A.* § 381, *et seq.,* denying the states the power to impose taxes on or measured by net income derived within the state from interstate commerce, if the only business activities carried on within the state are the solicitation of orders for sales of tangible personal property and the orders are sent outside the state for approval or rejection and are filled by shipment or delivery from a point outside the state. This very limited prohibition obviously does not apply to the taxpayers in the case at bar. The legislative approach being negative and not positive, we believe no inference may be drawn therefrom as to the power of the states to otherwise tax interstate commerce. This appears to be the view expressed in the report of the Senate Committee handling the legislation. *U. S. Code Congressional and Administrative News,* 86th Congress, First Session (1959) 2548, 2551.

proach the court took. The tax was for the privilege of engaging in business activities within the state, measured, as to the particular type of business involved, by the taxpayer's gross wholesale sales of motor vehicles, parts and accessories delivered within the state. General Motors conceded that certain of such sales were taxable, but that others were not because they were wholly in interstate commerce. The court upheld the tax as to all. Though a tax expressly based on the privilege of engaging in business in the state was involved, the court keyed its discussion to the proposition that interstate commerce must pay its just share of the state tax burden and in referring to *Spector,* quoted only that part of the opinion (previously set out herein) which expressed the view that a state is not precluded from imposing taxes upon activities or aspects of interstate business other than the privilege of doing such business. Mr. Justice Clark said that was what Washington sought to do and that the taxpayer had not shown that any of its activities within the state—so enmeshed as they were in local connections that some of them were concededly taxable—were incidents the state could not reach.

On the thesis of the progression of rationale shown by these decisions, viewed in the light of our statutory provisions, we conclude that it is correct to say that the New Jersey corporate business tax, by reason of the alternative bases set forth in the act, is not imposed upon foreign corporations merely or solely for the privilege of doing interstate business in New Jersey. We think also there is no longer necessarily any conclusive magic in the denomination of a tax as a "franchise" tax or by another label. We believe validity will now be judged, broadly speaking and in the absence of Congressional action, on whether it is a fairly apportioned, non-discriminatory means of requiring such a corporation to pay its just share of the cost of state government upon which it necessarily relies and by which it is furnished protection and benefit. We are of the opinion that

the New Jersey tax meets that test as applied to the taxpayers here involved.

It remains established that a tax on an exclusively interstate business verbally based solely on the privilege of doing such business in the state is constitutionally forbidden. We therefore construe that basis of New Jersey's tax to be inapplicable to taxpayers like those involved here. Since a state may not exclude such a corporation from doing such business within it, it may not exact an impost on the thesis of a condition of entry therein. More technically speaking, it is our view that the New Jersey tax is validly applicable to these taxpayers on the foundation of other bases expressed in the statute. The first is that the tax is expressly in lieu of "all other State, county or local taxation upon or measured by intangible personal property" of a foreign corporation, which kind of a tax we conceive could be validly imposed on a corporate entity of another state conducting an exclusively interstate business here. We believe the tax is additionally sustainable as a levy "for the privilege of * * * employing or owning capital or property, or maintaining an office, in this State", if not also "for the privilege of * * * exercising its corporate franchise" here. *N. J. S. A.* 54:10A–2. We think such privileges are sufficiently different from that of "doing" interstate business so that they are, in the sense stated in *Spector,* aspects of such business subject to the sovereign power of the state.

As has been previously outlined, these taxpayers' localized activities within New Jersey are very substantial and their reliance upon and the benefits received from the state government are sizeable and readily apparent. *Cf. National Bellas Hess, Inc. v. Department of Revenue of State of Illinois,* 386 *U. S.* 753, 87 *S. Ct.* 1389, 18 *L. Ed. 2d* 505 (1967). Quite apart from the intangible benefits all businesses receive by reason of the very existence of an orderly state government, a couple of specific things come to mind here as examples of particular benefit. The taxpayers' over-the-road vehicles, registered elsewhere and not paying any

license fees to New Jersey, in traveling over two and a half million miles in a year on highways here, must have very considerably utilized toll-free roads constructed and maintained by the state as well as county roads built or improved by State aid distributions. The vehicles and their cargoes were protected by the law enforcement activities of the state police force. The use of the courts necessarily also involved utilization of facilities and services provided by state revenues.

If a *quid pro quo* is thought of as having any bearing, the other taxes Roadway and Pilot paid cannot reasonably be thought of as adequate for the benefits and protection supplied by the state. Local real estate property taxes, imposed on all property owners, go only for local needs and no part thereof finds its way to the state treasury. The registration fees for the city fleet vehicles are not, under our system, moneys dedicated for highway purposes, but go into the general state fund. The same is true of motor fuel taxes, but these only produce revenue to the extent that a motor vehicle operator chooses to purchase fuel within the state. The so-called payroll taxes cannot be applied for general state purposes, but must become part of special funds only usable to pay unemployment compensation and similar benefits.

The judgments of the Division of Tax Appeals are affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.