CRABTREE, J.T.C.
Plaintiff, a New York corporation doing business in New Jersey, seeks review of deficiency assessments made by defendant under the Corporation Business Tax Act (CBTA), N.J.S.A. 54:10A-1 et seq. for calendar years 1969 through 1974. The assessments are based upon defendant’s exclusion of certain receipts from the receipts fraction specified in N.J.S.A. 54:10A-6 (hereafter, § 6). That statute apportions a corporation’s business activity in New Jersey for tax purposes on the basis of a three-part business allocation factor, composed of the average of a property fraction, a receipts fraction and a wage fraction. Only the composition of the receipts fraction is in issue here.
Plaintiff’s returns for each of the years involved reflected the following receipts fractions:
*641 1969 1970
Receipts in New Jersey $61,158,429 (1.7867%) $59,978,191 (2.073%)
Receipts everywhere $3,423,037,908 $2,893,288,934
1971 1972
Receipts in New Jersey $65,804,930 (2.0726%) $72,968,182 (0.8352%)
Receipts everywhere $3,174,941,087 $8,736,961,157
1973 1974
Receipts in New Jersey $83,122,907 (3.7348%) $95,672,929 (3.188%)
Receipts everywhere $2,225,634,833 $3,000,999,794
Defendant revised the denominator of the receipts fraction by deleting the following:
1969 1970 1971
Proceeds from sale of tangible property $25,818,708 $7,092,378 $26,883,945
Proceeds from sale or redemption of U.S. obligations 1,693,204,615 1,116,027,835 1,028,476,941
Proceeds from sale or redemption of state and local obligations 38,740,439 29,396,353 140,817,814
Proceeds from sale or redemption of FNMA notes 157,617,156
1972 1973 1974
Proceeds from sale of tangible property 20,218,637 $42,072,092
Proceeds from sale or redemption of U.S. obligations $758,691,758 579,452,304
Proceeds from sale or redemption of state and local obligations 137,900,100 11,977,283
Proceeds from sale or redemption of FNMA notes $48,602,500
*642 M2 1973 1974
Certificates of deposit, commercial paper, banker’s acceptances $5,870,597,945 ---- ----
Other 102 shares of stock ---- ----
Defendant revised the numerator of the receipts fraction by eliminating the following:
1969 1970 1971
Proceeds from sale of tangible personal property $3,183,229 $2,609 $75,338
1972 1973 1974
Proceeds from sale of tangible personal property $64,191 $155,592 $5,570,505
Defendant’s adjustments of the receipts fraction resulted in the following changes in that fraction and in the business allocation factor:
1969 1970 1971 1972 1973 1974
Receipts fraction reported 1.7867% 2.0733% 2.0726% 0.8352% 3.7348% 3.1880%
Receipts fraction adjusted 3.4781% 3.4469% 3.6092% 3.7948% 3.7620% 3.7898%
Business allocation factor reported 3.0024% 3.7300% 4.0629% 3.5518% 4.7922% 5.2065%
Business allocation factor adjusted 3.5662% 4.1879% 4.5751% 4.5383% 4.8012% 5.4071%
The foregoing adjustments resulted in the following deficiencies in tax, all of which, with interest, have been paid:
1969 1970 1971 1972 1973 1974
$126,871.02 $76,595.66 $52,552.33 $75,723.29 $1,334.97 $18,978.43
*643 Defendant determined that proceeds from the sale or redemption of intangible assets (i.e., government obligations, certificates of deposit, commercial paper and the like), including any gain thereon, as well as proceeds from the sale of tangible personal property, such as surplus telephone transmission and central office equipment, used in the conduct of plaintiff’s business, did not constitute business receipts within the meaning of § 6(B) of the CBTA, which provides as follows with respect to the receipts fraction of the business allocation formula:
(B) The receipts of the taxpayer, computed on the cash or accrual basis according to the method of accounting used in the computation of its net income for Federal tax purposes, arising during such period from
(1) sales of its tangible personal property located within this State at the time of the receipt of or appropriation to the orders where shipments are made to points within this State,
(2) sales of tangible personal property located without the State at the time of the receipt of or appropriation to the orders where shipment is made to points within the State,
(3) Deleted by amendment.
(4) services performed within the State,
(5) rentals from property situated, and royalties from the use of patents or copyrights, within the State,
(6) All other business receipts (excluding dividends excluded from entire net income by subsection (k)(l) of section 4 hereof) earned within the State, divided by the total amount of the taxpayer’s receipts, similarly computed, arising during such period from all sales of its tangible personal property, services, rentals, royalties and all other business receipts, whether within or without the State; . ..
At issue is the treatment, within the purview of § 6(B), of (a) the proceeds of sale of tangible personal property used in plaintiff’s business, (b) the proceeds of sale or redemption, including realized appreciation, of governmental obligations, commercial paper, banker’s acceptances and certificates of deposit (the intangibles) and (e) the interest increment realized upon sale or redemption of short-term governmental obligations issued at a discount (original issue discount).
Plaintiff is a regulated public utility which, at all times pertinent hereto, furnished interstate telecommunications services. Plaintiff was also the parent corporation of 23 telephone companies (the operating subsidiaries) as well as Western Electric Co., Inc. (its manufacturing arm) and Bell Telephone Labor *644 atories, Inc. (its research and development firm). Plaintiff, with these subsidiaries and other related companies, was known as the Bell System.
Plaintiff was functionally divided into two divisions, the Long Lines Department and the General Department. Plaintiff, through Long Lines, was responsible, jointly with its operating subsidiaries and approximately 1,500 non-Bell telephone companies, for the construction, operation and maintenance of a nationwide telecommunications system. Through its General Department plaintiff held stock in its subsidiaries and operated an investment program, one of the primary purposes of which was providing capital to its operating subsidiaries. The General Department was also responsible for rendering technical assistance and advice to the operating subsidiaries and conducting research on their behalf. Plaintiff was compensated by the subsidiaries for these advisory and research services by means of license contract fees.
During the years under review, plaintiff’s principal business transacted in New Jersey and its revenues attributable to the State were connected with the interstate telecommunications services provided by Long Lines, which operated in New Jersey just as it did in all other states, connecting with the local telephone companies to facilitate the furnishing of interstate services to customers. Only one of the operating subsidiaries, New Jersey Bell Telephone Company, conducted business within New Jersey.
During each of the years involved Long Lines sold between 100 and 200 items of tangible personal property used in its telecommunications operations. Generally, the property was central office equipment and low capacity cables sold, in place, to operating subsidiaries. (Occasional sales were made to unrelated firms such as ITT and RCA.) The items sold were declared surplus property by plaintiff’s management, and their disposition was impelled by state-of-the-art considerations. The items were still usable and were indeed put to good use by the subsidiaries acquiring them.
*645 A cash management pool was maintained at plaintiff’s General Department headquarters in New York City. It was designed for the temporary investment of excess cash, and its pattern of investment, withdrawals, sales and redemptions was dictated by cash position forecasts of the subsidiaries, capital needs of the Bell System’s construction programs, dividend payments to plaintiff’s shareholders and the maintenance of bank balances required by loan agreements (called compensating balances). The sources of funds for the pool were proceeds of long-term debt and equity issued by plaintiff, license contract fees paid by the operating subsidiaries, dividends paid to plaintiff by its subsidiaries and by other corporations in which plaintiff owned stock, and repayment of advances made by plaintiff to subsidiaries. These receipts totaled approximately $6 billion annually. Pool funds were devoted in large measure to short-term advances to operating subsidiaries, to equity investments in those subsidiaries to finance the latter’s ongoing construction programs and to the capital needs of the Long Lines interstate telephone operations.
Pool funds were temporarily invested in short-term securities consisting of governmental obligations (including original discount obligations), commercial paper, certificates of deposit in banking institutions and banker’s acceptances. All the securities were in bearer form. All pool activity took place in New York City and all personnel connected with it were located there.
There were between 600 and 1,500 pool investment transactions a year during the period in issue. The number varied from year to year, depending upon the size of individual investments.
Pool funds were invested in accordance with guidelines promulgated in a resolution of plaintiff’s Executive Committee adopted in 1968 and modified in 1973. Those guidelines limited pool investments to (a) governmental securities maturing in no more than 18 months from date of purchase, (b) certificates of deposit in commercial banks or banker’s acceptances maturing in 12 months, and (c) prime-rated commercial paper issued by a *646 United States corporation maturing within six months from purchase date. Included among governmental securities were short-term (one year or less) obligations issued at a discount by federal, state and local governments (hereafter referred to as original issue discount obligations). Within the framework of the guidelines, investment decisions were made by two traders, middle management employees of plaintiff, on the basis of each investment’s security, liquidity and yield.
The traders were supplied daily with data concerning cash needs of the Bell System. A cash meeting was held each morning to decide what funds were needed to maintain required bank balances and to pay current obligations. If a surplus of funds remained after provision for the day’s cash needs, that surplus would be invested to mature at a future date when the funds would be needed by the system. If there were insufficient funds on hand to meet the day’s cash needs, securities would be sold to obtain cash.
Plaintiff included in the denominator of the receipts fraction all operating revenues and other nonoperating income, gross proceeds from the sale of tangible personal property and the gross proceeds from the sale of redemption of the intangible investments (including realized appreciation thereon) in the cash management pool. Plaintiff excluded from the denominator all dividends required to be excluded by statute, income attributable to deferred taxes and interest charged to construction, as well as the proceeds of debt and equity issued by plaintiff and repayment of advances to subsidiaries.
Defendant excluded from the receipts fraction (but not from the tax base) interest attributable to original issue discount obligations. Otherwise, defendant included interest income arising from the pool investments in both the denominator of the receipts fraction and the tax base.
The Legal Issues
I. Introduction
The New Jersey Corporation Business Tax Act, N.J.S.A. 54:10A-1 et seq., is a franchise tax imposed by the State of New *647 Jersey upon every domestic and foreign corporation for the privilege of exercising the corporate franchise or for the privilege of doing business, employing or owning capital or property or maintaining an office in this State. N.J.S.A. 54:10A 2. The tax is computed by adding together specified percentages of a net worth tax base and a net income tax base, the latter being a prima facie reflection of federal taxable income with certain exceptions not here pertinent. N.J.S.A. 54:10A 4(d), (k) and 5. The tax is intended to reach foreign corporations doing an intrastate business, an interstate business, or both, as far as constitutionally permissible. Roadway Express, Inc. v. Taxation Div. Director, 50 N.J. 471, 236 A.2d 577 (1967), app. dism. 390 U.S. 745, 88 S.Ct. 1443, 20 L.Ed.2d 276 (1968). The statute, particularly § 6 thereof, reflects the recognition that the business activity of a multi-state enterprise within one particular state is inadequately measured by the worth of its assets or income in that state alone, but is enhanced by the activity of the entire enterprise. F.W. Woolworth Co. v. Taxation Div. Director, 45 N.J. 466, 213 A.2d 1 (1965).
Thus, § 6 of the act adopts a three-part formulary apportionment, called the business allocation factor, whereby the taxpayer’s New Jersey business is related to the business conducted by the entire multi-state enterprise. The formula is a composite of the average value of real and tangible personal property, receipts and payroll in New Jersey as against the totals thereof everywhere. It is designed to provide a method for allocating the net worth and net income of a multi-state enterprise and thus to ensure that the latter contributes its just share of the cost of state government. Roadway Express, Inc. v. Taxation Div. Director, supra.
The only issue in this case is the proper composition of the receipts fraction.
II. The Legislative Design
As indicated above, § 6(B) of the act mandates inclusion in the receipts factor of receipts from the sale of tangible personal property, services, rents and royalties, as well as “all other *648 business receipts [excluding certain dividends] earned” within or without New Jersey.
Section 5(c) of the CBTA imposes a tax on a corporate taxpayer’s entire net income allocable to New Jersey in accordance with § 6. The tax base “entire net income” is defined in § 4(k) to include gain derived from the employment of capital or labor (or a combination thereof) as well as “profit gained through a sale or conversion of capital assets.” The statute goes on to provide that entire net income is prima facie synonymous with federal taxable income, with certain exceptions, among which are the exclusion of 100% of dividends received from 80%-owned subsidiaries and 50% of all other dividend income. Those identical items are likewise excluded from the receipts fraction of § 6(B).
Sections 4, 5 and 6 — indeed, all sections — of the CBTA must be read in pari materia. Taken together, the provisions of the CBTA form a comprehensive plan for the imposition and collection of corporate business taxes and they must be read together as a unitary and harmonious whole. Dvorkin v. Dover Tp., 29 N.J. 303, 148 A.2d 793 (1959); Clifton v. Passaic Cty. Bd. of Taxation, 28 N.J. 411, 147 A.2d 1 (1959). Specifically, the composition of the receipts fraction must be determined in harmony with the definition of entire net income. That the Legislature intended this result is evidenced by the treatment of dividend income. The portion of such income excluded from the tax base is likewise excluded from the receipts fraction. To put it differently, the tax base and the receipts fraction are symmetrical. That which is excluded from the former is excluded from the latter and, conversely, that which is included in the former is also included in the latter.
Moreover, the phrase “all other business receipts,” as used in § 6(B)(6), is qualified by the requirement that such receipts be earned, an indication that the source of such receipts must also be income. This is a perfect case for the application of the maxim of ejusdem generis, which is to the effect that where general words follow a specific enumeration, the general *649 words (“all other business receipts”) are only applicable to the same general class of items specifically mentioned. Denbo v. Moorestown Tp., 23 N.J. 476, 129 A.2d 710 (1957); Manczak v. Dover Tp., 2 N.J. Tax 529 (Tax Ct.1981). See Resnick v. E. Brunswick Tp. Bd. of Ed., 77 N.J. 88, 100, 389 A.2d 944 (1978).
III. The Specific Items
A. Tangible Personal Property
In applying the foregoing principles to plaintiff’s sales of tangible personal property I conclude that only the net gain,[1] i.e., the excess of sale proceeds over the adjusted federal income tax basis for the property, is includible in the receipts fraction.
Defendant would further restrict the composition of the receipts fraction to income derived from sales of property held for sale to customers in the ordinary course of business. Defendant relies in large measure upon its own interpretative regulation, N.J.A.C. 18:7-8.9, as support for its position. That regulation provides:
(a) Receipts from sales of capital assets (property not held by the taxpayer for sale to customers in the regular course of business) either within or without New Jersey should not be included in either the numerator or denominator of the receipts fraction.
(b) Where the taxpayer’s business is the buying and selling of real estate or the buying, holding or selling of securities for investment purposes, these assets are not deemed to be capital assets and receipts from the sales thereof must be included in the same manner as other includible sales receipts.
This regulation imposes a restriction not warranted by the statute. As stated above, the composition of the receipts fraction is determined in harmony with the statutory definition of entire net income, which includes all gains, be they ordinary, capital, or a combination thereof. While it is true that construction of a taxing statute by the agency charged with its administration is entitled to some weight in a judicial proceeding, Public *650 Service Elec. & Gas Co. v. Woodbridge, 73 N.J. 474, 375 A.2d 1165 (1977), it is also well settled that an administrative interpretation which is inconsistent with the primary meaning of the statutory language will be ignored. Service Armament Co. v. Hyland, 70 N.J. 550, 362 A.2d 13 (1976); Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 197 A.2d 673 (1964).
B. Sale or Redemption of Intangibles
Plaintiff included in the denominator of the receipts fraction the full amount realized upon sale or redemption of the short-term obligations invested by the cash management pool. The pool was also the initial depository for several categories of proceeds, namely, dividends from plaintiff’s subsidiaries and other corporations, operating revenues from Long Lines, license contract fees, proceeds of debt and equity securities issued by plaintiff and repayment of short-term loans to subsidiaries. Of these proceeds only the operating revenues, license contract fees and 50% of nonsubsidiary dividends were included by plaintiff in the receipts fraction.
Plaintiff contends that the entire amount realized upon the sale or redemption of the short-term obligations in issue is includible in the receipts fraction as a business receipt within the meaning of § 6(B). For the reasons hereinbefore stated, only the income, including realized appreciation, derived from the sale or redemption of the short-term obligations is includible in the receipts fraction as a business receipt. Moreover, plaintiff’s argument, in so far as it pertains to the principal amount of the investment, must be rejected for another reason.
The evidence shows that the pattern of short-term investment within the cash management pool was entirely governed by the cash and capital needs of the members of the Bell System. In theory, at least, the same funds could be rolled over several times a year, depending upon those needs. Under plaintiff’s method of including in the receipts fraction the proceeds of sale or redemption of the intangibles involved the denominator of the fraction could easily be magnified unduly by the inclusion of *651 the same funds several times over, to the obvious detriment of all nondomiciliary states in which plaintiff does business. Furthermore, the principal invested in the short-term obligations is itself derived from other receipts, some of which (e.g., operating revenues and license contract fees) qualify for inclusion in the receipts fraction, while some (e.g., subsidiary dividends and proceeds of plaintiff’s debt or equity issues) do not. Acceptance of plaintiff’s argument would, by ignoring the source of the invested principal, create opportunities for circumvention of the apportionment statute, thereby relieving plaintiff of its obligation to contribute its just share to the cost of state government.
In construing a statute courts must give primary regard to the fundamental purpose for which the legislation was enacted, and when a literal reading will lead to a result not in accord with that purpose, the spirit of the law will control the letter. New Jersey Builders, Owners & Managers Ass’n v. Blair, 60 N.J. 330, 288 A .2d 855 (1972). The fundamental purpose of the apportionment statute and the three-factor formula embodied therein is to achieve a fair apportionment to New Jersey of business conducted by a multi-state enterprise such as plaintiff. F.W. Woolworth Co. v. Taxation Div. Director, supra. The literal reading of the phrase “business receipts” which plaintiff urges upon the court would create opportunities for improper enlargement of the denominator of the receipts fraction, both through duplication and inclusion of ineligible receipts, to the corresponding detriment of New Jersey. This construction is patently inimical to the legislative design.
The principal included in the proceeds of sale of redemption of the short-term investments is not includible in the receipts fraction.
There remains only the issue of the treatment of income from original issue discount obligations.
Some of plaintiff’s investments were made in short-term governmental obligations issued at a discount. The evidence reveals that some of those assets were sold or redeemed at maturity for an amount in excess of their original cost. This *652 increment is includible in the entire net income tax base by reason of § 4(k). Thus, in accordance with the principles of statutory construction applicable to the treatment of gain realized upon the disposition of other short-term obligations, the income derived from the disposition of the original issue discount obligations is includible in the receipts fraction.
Defendant’s regulation purporting to exclude from the receipts fraction proceeds from the disposition of capital assets, even if valid, has no application to original issue discount obligations, as they are not capital assets as that phrase is defined in the Internal Revenue Code. See § 1221(5) IRC.
Judgment will be entered in accordance with this opinion following exchange of computations and submission thereof to the court pursuant to R. 8:9-3.

“Net gain” means the aggregate gain realized from all sales of tangible personal property during each taxable year. If, in any such year, tangible personal property is sold at an aggregate loss, no part of the sales of tangible personal property for that year may be included in the receipts fraction.