**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

December 18, 2023

Rick A. Steinberg, Esq.
Price Meese Shulman & D'Arminio, P.C.
50 Tice Boulevard, Suite 380
Woodcliff Lake, New Jersey 07677

Deputy Attorney General Linzhi Wang
Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 106
Trenton, New Jersey 08625

> Re:  H&M Bay, Inc. v. Dir., Div. of Taxation
> Docket No. 012545-2021

Dear Mr. Steinberg and Deputy Attorney General Wang:

This shall constitute the court's opinion with respect to plaintiff, H&M Bay, Inc.'s ("plaintiff"), motion for summary judgment, and defendant, Director, Division of Taxation's ("defendant"), cross-motion for summary judgment. At issue is the imposition of a taxes against plaintiff under the New Jersey Corporation Business Tax Act of 1945, N.J.S.A. 54:10A-1 to -41 ("CBT Act"), for tax years 2013 through 2019.

For the reasons more particularly set forth below the court denies plaintiff's motion for summary judgment and denies defendant's cross-motion for summary judgment.

## I.  Procedural History and Factual Findings

In accordance with R. 1:7-4(a), the court makes the following factual findings based on the submissions of the parties.






Plaintiff is a Maryland corporation, having a principal place of business in Federalsburg, Maryland. Plaintiff is a federally licensed freight forwarder with national operating authority.[1] More specifically, it is an "LTL" (less-than-truckload) service provider, coordinating multiple "LTL shipments of temperature-controlled items throughout the United States."[2]

Plaintiff conducts its business in several different steps or stages. First, when plaintiff's customers seek to coordinate the shipment of their goods/freight, they email, call-in, fax, or electronically submit order requests to plaintiff's Maryland office. Plaintiff will then arrange for the freight pick-up at the designated location and transported,[3] by an independently owned trucking company/carrier,[4] to one of plaintiff's seven consolidation centers. Plaintiff maintains freight consolidation centers in Washington State, Indiana, Tennessee, Texas, Florida, Massachusetts, and Maryland. At the consolidation center, plaintiff's employees will unload the freight, combine, and coordinate multiple customers LTL shipments, and arrange for an independently owned trucking

---

[1] A "freight forwarder" is defined as a

> person holding itself out to the general public . . . to provide transportation of property for compensation and in the ordinary course of its business - (a) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments; (b) assumes responsibility for the transportation from the place of receipt to the place of destination; and (c) uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.
> [49 U.S.C.S. §13102.]

[2] During his deposition, plaintiff's Chief Operations Officer ("COO") testified that plaintiff also offers full "truckload service, but it's a very small portion of what we do."

[3] Under federal law, the term "transportation" includes, "(b) services related to that movement [of passengers or property], including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." 49 U.S.C.S. §13102.

[4] Carrier is defined as "a motor carrier, a water carrier, and a freight forwarder." 49 U.S.C.S. §13102. Moreover, the terms "motor carrier" is further defined as "a person providing motor vehicle transportation for compensation." Ibid.






company/carrier to pick-up the consolidated shipments and deliver them to the customer's buyer or consignee. When the freight is delivered, the consignee inspects it, performs a temperature check, signs the Bill of Lading, and provides a copy of the signed Bill of Lading to the independently owned trucking company/carrier's operator. The independently owned trucking company/carrier then submits a copy of the signed Bill of Lading to plaintiff, as its proof of delivery.

In December 2019, defendant issued plaintiff a Warrant of Execution Jeopardy Assessment, in the sum of $7,700.00 for alleged tax obligations under the CBT Act for tax years 2013 through 2019.

On or about February 19, 2020, plaintiff remitted payment of $7,700.00 to defendant by wire transfer to satisfy the Warrant of Execution Jeopardy Assessment.

On or about February 24, 2020, plaintiff filed an administrative protest and request for a hearing with defendant's Conference and Appeals Branch. An informal administrative conference was conducted on or about August 24, 2021.

On or about September 22, 2021, defendant issued a Final Determination upholding the Jeopardy Assessment, denying plaintiff's refund request, requiring plaintiff to register to do business in New Jersey, and requiring plaintiff to file CBT returns for the 2013 to 2019 tax years ("Final Determination").

On or about October 27, 2021, plaintiff filed a complaint with the Tax Court challenging defendant's Final Determination.

On July 31, 2023, plaintiff filed the instant motion for summary judgment. Plaintiff contends that P.L. 86-272, 15 U.S.C.S. § 381 (1959), confers immunity on plaintiff from taxes under the CBT Act. In addition, plaintiff maintains that it does not have a taxable nexus in New






Jersey, and any in-state activities and receipts derived from New Jersey sources are sufficiently *de minimis* and/or trivial.

Specifically, plaintiff argues that it is exempt from New Jersey corporate business taxes because it does not exercise its corporate franchise in New Jersey or do business in New Jersey. Plaintiff emphasizes that it does not have any employees in New Jersey, does not own any trucks that transport freight into New Jersey, does not own any trucks registered in New Jersey, does not own any equipment in New Jersey, and does not own or rent any offices, warehouses, or other facilities in New Jersey.

Plaintiff maintains that all coordinated LTL freight deliveries to New Jersey and all coordinated LTL freight shipments from New Jersey, are undertaken by independently owned trucking companies/carriers that plaintiff has no ownership interest in. Moreover, plaintiff emphasizes that the independently owned trucking companies/carriers are not authorized to act on plaintiff's behalf and do not accept payment for the pickup or delivery of any of plaintiff's customers' freight.

As a freight forwarder, plaintiff asserts that it is not the shipper of the freight.[5] Although plaintiff concedes that as part of its business, it may arrange for freight to be temporarily stored in New Jersey on behalf of its customers, it emphasizes that it does not own any of the freight.

On October 10, 2023, defendant filed a cross-motion for summary judgment. Defendant charges that plaintiff engages in nonprotected activities under P.L. 86-272. Moreover, defendant contends that plaintiff provides freight "brokering" services to customers domiciled in New Jersey,

---

[5] The term "individual shipper" is defined as "any person who – (a) is the shipper, consignor, or consignee of a household goods shipment; (b) is identified as the shipper, consignor, or consignee on the face of the bill of lading; (c) owns the goods being transported; and (d) pays his or her own tariff transportation charges." 49 U.S.C.S. §13102.



coordinates the weekly pick-up and delivery of freight in New Jersey, regularly arranges for the pick-up and delivery of freight to two cold storage warehouses in New Jersey, avails itself of New Jersey's roadways, and that the independently owned trucking companies/carriers should be viewed as agents of plaintiff transacting business in New Jersey. Thus, defendant asserts that plaintiff is doing business in New Jersey. Finally, defendant highlights that plaintiff has approximately 238 customers in New Jersey and directly derives receipts from New Jersey sources. In sum, defendant argues that plaintiff is subject to tax under the CBT Act.

## II. Conclusions of Law

### A. Summary judgment standard

Summary judgment "'serve[s] two competing jurisprudential philosophies': first, 'the desire to afford every litigant who has a *bona fide* cause of action or defense the opportunity to fully expose his case,' and second, to guard 'against groundless claims and frivolous defenses,' thus saving the resources of the parties and the court." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 541-42 (1995) (emphasis in original)).

Rule 4:46-2 outlines the circumstances under which summary judgment should be granted:

> if the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.

[R. 4:46-2.]

In Brill, our Supreme Court adopted the federal approach to resolving motions for summary judgment, in which the "essence of the inquiry [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must






prevail as a matter of law." 142 N.J. at 536 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 251-52 (1986)). In conducting this inquiry, the trial court must engage in a "kind of weighing

that involves a type of evaluation, analysis and sifting of evidential materials." Ibid. The standard

established by our Supreme Court in Brill is as follows:

> [W]hen deciding a motion for summary judgment under R. 4:46-2,
> the determination of whether there exists a genuine issue with
> respect to a material fact challenged requires the motion judge to
> consider whether the competent evidential material presented, when
> viewed in the light most favorable to the non-moving party in
> consideration of the most applicable evidentiary standard, are
> sufficient to permit a rational fact finder to resolve the alleged
> disputed issue in favor of the non-moving party.
>
> [Id. at 536.]

In considering all the material evidence before it with which to determine if there is a

genuine issue of material fact, the court must view most favorably those items presented to it by

the party opposing the motion and all doubts are to be resolved against the movant. Ruvolo v.

American Casualty Co., 39 N.J. 490, 491 (1963). A court charged with "deciding a summary

judgment motion does not draw inferences from the factual record as does the factfinder in a trial,

. . . [i]nstead, the motion court draws all legitimate inferences from the facts in favor of the non-

moving party." Globe Motor Co., 225 N.J. at 480 (internal citations omitted). Thus, the moving

party bears the burden "to exclude any reasonable doubt as to the existence of any genuine issue

of material fact" with respect to the claims being asserted. United Advertising Corp. v. Borough

of Metuchen, 35 N.J. 193, 196 (1961).

"By its plain language, R. 4:46-2 dictates that a court should deny a summary judgment

motion only where a party opposing the motion has come forward with evidence that creates a

'genuine issue as to any material fact challenged.'" Brill, 142 N.J. at 529. However, when the






party opposing the motion merely presents "facts which are immaterial or of an insubstantial nature, a mere scintilla, fanciful, frivolous, gauzy or merely suspicious," then an otherwise meritorious application for summary judgment should not be defeated. Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75 (1954). Hence, "when the evidence is so one-sided that one party must prevail as a matter of law . . . the trial court should not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Liberty Lobby, Inc., 477 U.S. at 252).

Applying the foregoing standards to the motion and cross-motion for summary judgment and having reviewed the certifications and exhibits submitted in support of, and in opposition thereto, the court finds that genuine issues of material fact remain unresolved. Therefore, resolution of this matter by summary judgment is not appropriate. An insufficient motion record exists demonstrating: (i) the gross shipments and revenue derived by plaintiff from New Jersey customers/contacts and plaintiff's national gross shipments and revenues, to gauge whether plaintiff's coordination of freight shipments and revenue derived from New Jersey sources was *de minimis*; (ii) that plaintiff exerts sufficient control over the independently owned trucking companies/carriers to enable the court to conclude that they are agents of the plaintiff; and (iii) the frequency and scope of plaintiff's sales representatives activities in New Jersey.

### B. Federal protections

The ability of a state to impose a tax on a foreign corporation's income must be weighed by evaluating federal constitutional prohibitions or limitations, including Due Process Clause and Commerce Clause and protections.

#### 1. Due Process Clause

The Due Process Clause of the Fourteenth Amendment, prohibits any State from "depriv[ing] any person of life, liberty, or property, without due process of law; nor deny to any






person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.  The Due Process Clause "requires some definite link, some minimum connection, between a state and the person, property, or transaction that the state seeks to tax." Miller Bros. Co. v. Maryland, 347 U.S. 340, 342 (1954).  Moreover, the "income attributed to the state for tax purposes must be rationally related to 'values connected with the taxing state.'" Moorman Mfg. Co. v. Bair, 437 U.S. 267, 273 (1978) (quoting Norfolk & Western R. Co. v. State Tax Comm'n, 390 U.S. 317, 325 (1968)).

### 2. Commerce Clause

The Commerce Clause, vests with Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.  However, it also serves to preclude States from "discriminat[ing] between transactions on the basis of some interstate element," commonly known as the dormant Commerce Clause.  Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318, 332, n. 12 (1977).  Under modern dormant Commerce Clause jurisprudence, for a state to tax an out-of-state corporation, the tax must be: (i) "applied to an activity with a substantial nexus with the taxing State," (ii) "fairly apportioned," (iii) nondiscriminatory with respect to interstate commerce; and (iv) "fairly related to the services provided by the State." Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977); Mobil Oil Corp. v. Commissioner of Taxes, 445 U.S. 425, 436-37 (1980); Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 165-66 (1983).  Thus, generally, the dormant Commerce Clause inquiries focus on whether a substantial nexus exists between the taxpayer and the State to permit the taxation of income.

As the United States Supreme Court recently observed, the

> nexus requirement is 'closely related,' to the due process requirement that there be "some definite link, some minimum connection, between a state and the person, property or transaction






it seeks to tax.' It is settled law that a business need not have a physical presence in a State to satisfy the demands of due process. Although physical presence 'frequently will enhance' a business' connection with a State, 'it is an inescapable fact of modern commercial life that a substantial amount of business is transacted . . . [with no] need for physical presence within a State in which business is conducted.'

[South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2093 (2018) (internal citations omitted.]

Here, plaintiff initially contends that its activities are insulated from state taxation under P.L. 86-272. Alternatively, plaintiff argues that even if its activities are not protected under P.L. 86-272, its business activities lack a substantial nexus with New Jersey to be subject to taxation under the first criteria under Complete Auto Transit's four-part test. 430 U.S. at 279.

3. 15 U.S.C.S. § 381(a)/ P.L. 86-272

15 U.S.C.S. § 381(a) (commonly referred to as "P.L. 86-272"), deprives states of the "power to impose taxes on or measured by net income derived within the state from interstate commerce," if the only business activities being conducted in the State amount to "the solicitation of orders for sales of tangible personal property, where the orders are sent outside the state for approval or rejection and are filled by shipment or delivery from a point outside the state." Walter Hellerstein, Kirk J. Stark, John A. Swain, & Joan M. Youngman, State and Local Taxation, 91 (10th ed. 2014).

Under P.L. 86-272, a state is prohibited from imposing a tax on a corporation's net income doing business in the state if their in-state activities are limited to:

> (1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
>
> (2) the solicitation of orders by such person, or his representative, in






such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

[15 U.S.C.S. § 381(a) (emphasis added).]

Thus, under P.L. 86-272, Congress did not impose limitations on how entities may engage in business activities beyond its protections, rather it established a floor below which a state may not impose a tax on corporation's net income.[6] Stated differently, P.L. 86-272 does not prohibit a State from imposing a tax on a foreign corporation's net income if the taxpayer's business activities in that State are more substantial than those identified under P.L. 86-272.

Accordingly, for plaintiff to be entitled to the protection afforded under P.L. 86-272, it must demonstrate that its business activities in New Jersey: (i) comprise of the solicitation of orders; (ii) involve the sale of tangible personal property; (iii) the orders must be sent outside of New Jersey for approval or rejection; and (iv) the approved orders are filled by shipment or delivery from points outside of New Jersey.

However, as aptly observed by Judge Lario, "[t]he term tangible personal property is not defined within [15 U.S.C.S.] § 381 . . ." Pomco Graphics, Inc. v. Dir., Div. of Taxation, 13 N.J. Tax 578, 587 (Tax 1993). Accordingly, when a court is faced with interpreting a federal statute, the initial step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"

---

[6] The Senate Report supporting adoption of P.L. 86-272 stated, in part, that "[w]e conclude that net income from the interstate operation of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." Sen. Rep. No. 658, 86th Cong., 1st Sess., p. 2549 (1959).






Robinson v. Shell Oil Co., 519 U.S. 337, 340-41 (1997) (quoting United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)).  The ordinariness or ambiguity of the "statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Ibid.  Stated differently, if the statutory language is straightforward and clear, it should "be given their common ordinary meaning."  Pomco Graphics, Inc., 13 N.J. Tax at 587 (citing Reliable Volkswagen Sales & Service Co. v. World Wide Auto Corp., 216 F. Supp. 141 (D.C.N.J. 1963)).

Here, plaintiff renders a service for its shipping customers, specifically, it acts as an LTL provider, coordinating and combining multiple less-than-truckload shipments of freight throughout the United States.  Although plaintiff bears liability to its customers for the freight, that it timely arrives, and is not spoiled, plaintiff does not have an ownership interest in the freight being shipped.  Plaintiff's customers do not select or directly interact with the independently owned trucking companies/carriers responsible for transporting the freight, rather they engage plaintiff as their point of contact person to coordinate the pick-up and timely delivery of the freight.

Accordingly, the court finds that plaintiff does not solicit orders for the sale of tangible personal property, as such phrase is construed under 15 U.S.C.S. § 381(a)(1).[7]  The court's plain reading of 15 U.S.C.S. § 381(a)(1) demonstrates that Congress intended to narrowly tailor its applicability to the solicitation of orders for the sale of tangible personal property.  Plaintiff performs a service for its customers/shippers, and thus, does not solicit orders for the sale

---

[7]  Neither plaintiff, nor defendant raised or advanced any argument under their motions for summary judgment that the provisions of 15 U.S.C.S. § 381(a)(2) should apply to the instant matter.  Moreover, they have not offered any caselaw or jurisprudence disclosing the applicability of subsection (a)(2) to this matter.  In fact, during oral argument, plaintiff's counsel conceded that plaintiff does not sell tangible personal property as such term is construed under 15 U.S.C.S. § 381(a)(1).






of tangible personal property. Thus, plaintiff's business activities in New Jersey during the taxable periods at issue fall outside of the protections afforded under 15 U.S.C.S. § 381(a)(1).

### C. Presumption of correctness

The defendant's interpretation of tax statutes is entitled to a presumption of validity. Thus, the court affords substantial deference to defendant's construction of a tax statute, "which is not plainly unreasonable and with which the Legislature has not interfered. . . ." Aetna Burglar & Fire Alarm Co. v. Dir., Div. of Taxation, 16 N.J. Tax 584, 589 (1997) (citing Vavoulakis v. Dir., Div. of Taxation, 12 N.J. Tax 318, 332 (1992), aff'd, 13 N.J. Tax 322 (App. Div. 1993)). The defendant's "expertise in the highly specialized and technical area of taxation . . . is entitled to great respect by the courts." Quest Diagnostics, Inc. v. Dir., Div. of Taxation, 387 N.J. Super. 104 (App. Div. 2006), certif. denied, 188 N.J. 577 (2006) (citing Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 327 (1984)).

However, a court's "deference" for defendant's findings is not absolute, "as the courts remain the 'final authorities' on the issues of statutory construction and are not obliged to 'stamp' their approval of the administrative interpretation.'" Koch v. Dir., Div. of Taxation, 157 N.J. 1, 15 (1999) (citing New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 575 (1978)). "[A]n administrative agency's interpretation will not be followed when the agency extends a statute 'to give it a greater effect than its language permits.'" Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 568 (2008) (quoting GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 306 (1993)). Accordingly, when an agency's construction of "a statute is plainly at odds with the plain meaning of the statute, the agency interpretation will be set aside." Ibid.

### D. Taxation of corporation income

The CBT Act requires every non-exempt corporation wielding its franchise in New Jersey,






deriving New Jersey sourced revenue, or doing business in New Jersey, to annually file a corporate business tax return and pay a tax. Specifically, N.J.S.A. 54:10A-2 provides that:

> Every domestic or foreign corporation which is not hereinafter exempted shall pay an annual franchise tax for each year . . . <u>for the privilege of having or exercising its corporate franchise in this State,</u> or <u>for the privilege of deriving receipts from sources within the State</u>, or <u>for the privilege of doing business, employing or owning capital or property, or maintaining an office, in this State</u>.

> [N.J.S.A. 54:10A-2 (emphasis added).]

Therefore, unless statutorily "expressly exempted," every corporation is required to pay New Jersey an annual franchise tax. N.J.A.C. 18:7-1.6(a). The CBT Act is intended to "reflect[] the recognition that the business activity of a multi-state enterprise within one particular state is inadequately measured by the worth of its assets or income in that state alone but is enhanced by the activity of the entire enterprise." <u>Stryker Corp. v. Dir., Div. of Taxation</u>, 168 N.J. 138, 148 (2001) (citing <u>American Tel. & Tel. v. Dir., Div. of Taxation</u>, 4 N.J. Tax 638, 648 (Tax 1982), <u>aff'd</u>, 194 N.J. Super. 168 (App. Div. 1984)).

Importantly however, a corporation need not have a physical presence in New Jersey to be subject to tax under the CBT Act. Our Appellate Division has stated that, "the physical presence requirement applicable to use and sales taxes is not applicable to income tax and that the New Jersey Business Corporation Tax may be constitutionally applied to income derived" from intangible assets attributable to New Jersey. <u>Lanco, Inc. v. Dir., Div. of Taxation</u>, 379 N.J. Super. 562, 573 (App. Div. 2005), <u>aff'd</u>, 186 N.J. 245 (2006).

Defendant's regulations express the view that a corporation will be subject to tax under the CBT Act if it fulfills "<u>any one of the following</u>" eight criteria: (i) "hold[s] a general Certificate of Authority to do business" in New Jersey; (ii) "hold[s] a certificate, license, or other authorization






issued by State [of New Jersey] department or agency"; (iii) is "[d]oing business" in New Jersey;

(iv) "employ[s] or own[s] capital in this State"; (v) "employ[s] or own[s] property in this State";

(vi) "maintain[s] an office in this State"; (vii) "deriv[e] receipts from sources within this State";

and (viii) "engag[es] in contact within this State." N.J.A.C. 18:7-1.6(a)(2) (emphasis added); see

also N.J.A.C. 18:7-1.8(a).

      1.    Exclusions and exemptions

The CBT Act provides that "foreign corporations shall not be deemed to be deriving

receipts, [or] . . . doing business" in New Jersey, because of:

> (1) the maintenance of cash balances with banks or trust companies in this State, or (2) the ownership of . . . stock or securities in this State if such shares or securities are pledged as collateral security, or deposited with one or more banks or trust companies or brokers who are members of a recognized security exchange, in safekeeping or custody accounts, or (3) the taking of any action by any such bank or trust company or broker, which is incidental to the rendering of safekeeping or custodian service to such corporation, or (4) . . . the operation of a motor vehicle or motorbus operated over public highways or public places in this State for the carriage of passengers in transit from a location outside this State to a destination in this State and for the carriage of those passengers in transit from a location in this State to a location outside this State.
>
> [N.J.S.A. 54:10A-2.]

The CBT Act further identifies eleven corporations that are "exempt from tax" including:

> (a) Corporations subject to a tax assessed upon the basis of gross receipts, other than the alternative minimum assessment . . . [under N.J.S.A. 54:10A-5a] . . . ; (b) Corporations which operate regular route autobus service within this State under . . . [N.J.S.A.] 48:4-3. . . ; (c) Railroad, canal corporations . . . ; (d) Cemetery corporations not conducted for pecuniary profit . . . ; (e) Nonprofit corporations, associations or organizations established, organized or chartered . . . , under the provisions of Title 15, 16 or 17 of the Revised Statutes, Title 15A of the New Jersey Statutes . . . ; (f) Sewerage and water corporations subject to a tax under . . . [N.J.S.A.] 54:30A-49 . . . ; (g) Nonstock corporations organized . . . to provide mutual






ownership housing under federal law by tenants . . . ; (h) Corporations not for profit . . . where the primary purpose thereof is to provide for its shareholders or members housing in a retirement community . . . ; (i) Corporations which are licensed as insurance companies under the laws of another state . . . ; (j) Municipal electric corporations that were in existence as of January 1, 1995 . . . ; and (k) A rural electric cooperative which is exclusively owned and controlled by the members it serves and is subject to the provisions of . . . [N.J.S.A.] 48:24-1 . . .

[N.J.S.A. 54:10A-3.]

Here, it is undisputed by plaintiff and defendant that none of the activities set forth under N.J.S.A. 54:10A-2 are at issue in this matter. Moreover, plaintiff does not allege that it satisfies any of the eleven categories of exempt corporate entities, under N.J.S.A. 54:10A-3, warranting exemption from tax under the CBT Act.

Accordingly, as succinctly and cogently expressed by Justice Jacobs more than sixty-years ago, the court must conduct a "careful examination of the true nature of the tax . . . and the detailed facts relating to the properties and activities . . . within New Jersey, . . . " to gauge whether the activities may be subject to state taxation. Roadway Express, Inc. v. Kingsley, 37 N.J. 136, 140 (1962). The court's inquiry must focus on a detailed analysis of plaintiff's business operations in and with New Jersey, and carefully apply the three statutory criteria for taxation, (i) exercising its corporate franchise in New Jersey; (ii) deriving receipts from New Jersey sources; and (iii) doing business, maintaining employees, or owning capital or property in New Jersey, to those activities.

2. Exercising its corporate franchise

The CBT Act contains no precise definition of the phrase "exercising its corporate franchise." Rather, our Supreme Court in Werner Mach. Co. v. Dir., Div. of Taxation, construed that phrase with "the privilege of exercise by the corporation of corporate powers in this State." 17 N.J. 121, 126-127 (1954). In construing such phrase, defendant's regulations state that, a






foreign corporation will be viewed as exercising its corporate or franchise in New Jersey, "if the taxpayer's business activity in this State is sufficient to give this State jurisdiction to impose the tax under the Constitution and statutes of the United States." N.J.A.C. 18:7-1.6(b). Moreover, an examination of defendant's regulations further reveals that when a foreign corporation "engages in contacts within New Jersey . . . regardless of whether it has formally qualified or is authorized to do business in New Jersey," it will be viewed as exercising its corporate franchise in New Jersey. N.J.A.C. 18:7-1.8(a).

Moreover, defendant's regulations offer insight and a meaningful example of when a foreign corporation will be viewed as exercising its corporate franchise in New Jersey:

> An entity <u>regularly providing</u> asset management services . . . from a location outside New Jersey to customers within New Jersey is subject to tax in New Jersey.
>
> [N.J.A.C. 18:7-1.6(b) (emphasis added).]

Thus, the focus of the court's inquiry in gauging whether a foreign corporation is exercising its corporate franchise in New Jersey will center on a corporation's regular exercise of its corporate powers in New Jersey, its actions in New Jersey, and its relationship with New Jersey contacts.

Here, plaintiff is not incorporated in New Jersey, not registered to do business in New Jersey, owns no trucks registered in New Jersey, has no employees in New Jersey, and has no physical presence in New Jersey. Moreover, the motion record does not disclose that any trucks owned by plaintiff regularly enter New Jersey. Additionally, the motion record does not demonstrate that plaintiff has ever availed itself of the New Jersey courts to resolve differences encountered with any independently owned trucking company/carrier, customer, or a customer's consignee. Although not an undisputed material statement of fact, defendant argues that from 2013 to 2019, plaintiff allegedly coordinated the delivery of 47,600 freight orders into New Jersey.






However, the motion record does not disclose how many, if any, of these shipments were made on behalf of plaintiff's New Jersey domiciled customers and contacts. Thus, were the coordinated shipments made to plaintiff's customers or were they for plaintiff's customers consignees? Moreover, defendant highlights that plaintiff identified approximately 238 customers having a domicile in New Jersey. Yet, during the tax years at issue, defendant has identified only one New Jersey domiciled customer, with shipments totaling approximately $130,000, or an average of $18,571 per year, which plaintiff asserts were *de minimis* activities, revenue, and contacts with New Jersey (discussed *infra*).

In addition, plaintiff's COO's deposition transcript further reveals that customer orders are either emailed, called in, faxed, or electronically to its Maryland office. However, the deposition transcript fails to reveal how many of the orders, during the tax periods at issue, originated from customers domiciled in New Jersey. One of the central inquiries to be made by the court in discerning whether a taxpayer is exercising its corporate franchise in New Jersey requires consideration of whether the taxpayer "engages in contacts within New Jersey." N.J.A.C. 18:7-1.8(a). Although the motion record reveals that plaintiff has serviced more than 200 customers in New Jersey, the motion record fails to disclose how many of those customers placed freight shipment consolidation orders with the plaintiff during the tax years at issue.

Accordingly, the court is not satisfied that the motion record before the court adequately discloses that plaintiff regularly availed itself of the benefit of New Jersey customers and contacts, or the New Jersey marketplace and economy, during the tax years at issue to support a finding that plaintiff has exercised its corporate franchise in New Jersey.

      3.     <u>Deriving receipts from sources in New Jersey</u>

As stated above, the motion record reveals that between 2013 and 2019, plaintiff had






approximately 238 customers domiciled in New Jersey. In addition, from 2016 to 2022, plaintiff was paid a total of approximately $130,000, or an average of $18,571 per year, for coordinating freight pick-ups and deliveries for one of plaintiff's New Jersey domiciled customers. Moreover, it is further undisputed that plaintiff's COO testified during his deposition that in the tax years at issue, plaintiff coordinated the pick-up of "freight in the State of New Jersey weekly, and . . . [coordinated the delivery of] freight into New Jersey weekly." In his opinion, "I would consider delivering into the State of New Jersey a regular occurrence," however, he also expressed that "I would also consider delivering into most of the lower 48 states a regular occurrence." Accordingly, plaintiff maintains that "to the extent that any business was conducted in New Jersey by H&M Bay, Inc. [and it derived receipts therefrom], it was *de minimis* and [should be] exempt from assessment."

In response, defendant asserts that plaintiff's receipt, during the tax years at issue, of approximately $130,000 in revenue from a New Jersey source subjects plaintiff to tax under the CBT Act, under N.J.A.C. 18:7-1.6(a)(2)(vii).

Under N.J.A.C. 18:7-1.6(a), a foreign corporation "is deemed to be subject to tax under the [CBT] Act and is required to file a return and pay a tax thereunder," if it "deriv[es] receipts from sources within this State." N.J.A.C. 18:7-1.6(a)(2)(vii). However, N.J.A.C. 18:7-1.6(a)(2)(vii) offers no minimum threshold or standard under which the court should measure its application. Thus, a foreign corporation's receipt of a trivial sum of revenue from a New Jersey source would seemingly obligate a foreign corporation to nonetheless remit tax to New Jersey.

However, the court finds such unyielding interpretation would be contrary to the United States Supreme Court's admonition in William Wrigley, Jr., Co., stating that "[i]t would be . . . unreasonable to abandon normal application of the *de minimis* principle . . . [in] reading . . . the






statute [in a stark, all-or-nothing fashion] render[ing] a company liable for hundreds of thousands of dollars in taxes if one of its salesmen sells a 10-cent item in state." 505 U.S. at 231. The court's interpretation is further shaped by the example offered in defendant's regulations, under N.J.A.C. 18:7-1.6(b), reciting that a foreign corporation that "regularly provid[es] . . . services . . . from a location outside New Jersey to customers within New Jersey is subject to the [franchise] in New Jersey." N.J.A.C. 18:7-1.6(b)(emphasis added).

Rather, the court adheres to the approach adopted by the United States Supreme Court that considers "[w]hether a particular activity is a *de minimis* deviation from a prescribed standard must, of course, be determined with reference to the purpose of the standard." William Wrigley, Jr., Co., 505 U.S. at 232. As observed by our Supreme Court, the CBT Act's purpose "reflect[s] the recognition that the business activity of a multi-state enterprise within one particular state is inadequately measured by the worth of its assets or income in that state alone but is enhanced by the activity of the entire enterprise." Stryker Corp., 168 N.J. at 148. Thus, assets and income alone may be an inadequate gauge of an entity's nexus to an individual state, but rather how is the entity's business enterprise and regular business operations are enriched by its contacts with and ability to serve the needs of its customers within that state. Accordingly, do the receipts derived by plaintiff from New Jersey sources during the tax years at issue amount to only trivial or *de minimis* revenue, or was plaintiff regularly engaging in consistent and systematic services for New Jersey domiciled customers as part of plaintiff's business enterprise?

During the tax years at issue, plaintiff was undoubtedly providing LTL services to one customer domiciled in New Jersey, and thus, derived revenue from a New Jersey source. The defendant has offered undisputed evidence that, during the tax years at issue, plaintiff derived revenue from that customer averaging approximately $18,571, per year. However, the extent to






which those receipts were interrelated to plaintiff's entire business enterprise, or whether plaintiff derived receipts from any other New Jersey source, was wholly unclear. Therefore, the court finds that an inadequate motion record exists enabling the court to conclude that plaintiff, under N.J.A.C. 18:7-1.6(a)(2)(vii), derived receipts from sources in New Jersey that were *de minimis* or trivial to plaintiff's business enterprise.

    4. <u>Doing business</u>

Our courts have long observed that "[t]here is no one, single controlling factor nor is there a bright line standard that determines whether a foreign corporation's in-state activities meet the Director's regulatory requirements for doing business." <u>Thomson-Leeds Co., Inc. v. Dir., Div. of Taxation</u>, 8 N.J. Tax 24, 32 (Tax 1985) (citing <u>Ringgold Coal Mining Co. v. Dir., Div. of Taxation</u>, 4 N.J. Tax 321, 332 (Tax 1982)).

The defendant's regulations define "doing business" as "includ[ing] all activities that occupy the time or labor of men or women for profit." N.J.A.C. 18:7-1.9(a). In analyzing whether a "foreign corporation is doing business in New Jersey," defendant's regulations recite that the following factors should be considered:

1. The nature and extent of the activities of the corporation in New Jersey;
2. The location of its offices and other places of business;
3. The continuity, frequency, and regularity of the activities of the corporation in New Jersey;
4. The employment in New Jersey of agents, officers, and employees; and
5. The location of the actual seat of management or control of the corporation.

  [N.J.A.C. 18:7-1.9.]

Thus, whether a foreign corporation is "doing business" in New Jersey, under the auspices of N.J.A.C. 18:7-1.6(a)(2)(iii), requires the court to closely scrutinize "all the facts of the case,

   

taken as a whole." Thomson-Leeds Co., Inc., 8 N.J. Tax at 32. Importantly however, the court's examination must be "based not on the absence of factors found in prior judicial decision, but rather on the presence of unique contact that distinguish the instant case and indicate a taxable presence . . . , it is not only a quantitative but also a qualitative examination of the nature and extent of plaintiff's business activities that determines if the definitional factors of 'doing business' have been met." Id. at 33-34.

Here, plaintiff asserts that it does not do business in New Jersey, as such term is construed under the CBT Act, and thus has no nexus with New Jersey. Specifically, plaintiff highlights that it has no permanent, physical presence in New Jersey, owns no real property in New Jersey, has no trucking terminals, offices, or warehouses in New Jersey, and has no employees in New Jersey. Plaintiff emphasizes that it does not sell any tangible products and has no ownership interest in the tangible products being delivered to or shipped from New Jersey, as it is an LTL provider, offering freight forwarding and freight consolidation services. Plaintiff highlights that all freight consolidation centers are located outside of New Jersey. Finally, plaintiff maintains that it does not own any trucks registered in New Jersey, and all freight deliveries to or shipments from New Jersey are handled by independently owned trucking companies/carriers pursuant to orders accepted by plaintiff outside of New Jersey. In sum, plaintiff maintains that its lack of nexus with New Jersey renders defendant's assessment of franchise tax impermissible.

In response to plaintiff's arguments, and in support of its cross-motion for summary judgment, defendant highlights that plaintiff coordinates the pick-up and delivery of plaintiff's customers/shippers' freight in New Jersey weekly. Defendant emphasizes that plaintiff's customers never deal directly with the independently owned trucking companies/carriers hauling the freight, rather plaintiff's customers view plaintiff as their point of contact for the shipment.

   

Although not an undisputed material statement of fact, defendant argues in its brief that from 2013 to 2019, plaintiff allegedly coordinated the delivery of 47,600 freight orders into New Jersey. In addition, defendant asserts that from 2013 to 2023, plaintiff allegedly coordinated more than 9,600 freight deliveries on behalf of plaintiff's customers/shippers to two cold storage warehouses located in New Jersey.

Defendant further contends that the court should view the relationship between plaintiff and the independently owned trucking companies/carriers responsible for delivering plaintiff's customers freight to, or picking up from New Jersey, as a master-servant or principal-agent relationship.

Finally, defendant asserts that as an "LTL service provider, plaintiff consolidates loads from different customers in New Jersey and through its agents, the truck drivers, travel all over the State with cargos on roads constructed and maintained by the State." Thus, defendant argues that plaintiff, in arranging for independently owned trucking companies/carriers to make deliveries to New Jersey or pick up shipments from New Jersey, plaintiff is availing itself of "New Jersey infrastructure and support funded by taxpayer money."

A. Agency

Our Supreme Court has stated that,

> [a]n agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent. There need not be an agreement between parties specifying an agency relationship; rather, 'the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation'. . . Moreover, direct control of principal over agent is not absolutely necessary; a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent.






[Sears Mortgage Corp. v. Rose, 134 N.J. 326, 337-38 (1993) (internal citations omitted).]

The Restatement (Second) of Agency contains a similar definition, stating:

(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.
(2) The one for whom action is to be taken is the principal.
(3) The one who is to act is the agent.

[Restatement (Second) of Agency, § 1 (1958) (emphasis added).]

"The agency relationship encompasses a [broad] spectrum of arrangements extending generally from principal-independent contractor to master-servant. The term independent contractor 'is used as a term to indicate someone employed but who is not a servant of the employer . . . [W]hile the term is antithetical to the term servant, all agents except servants fall within its meaning." Sodexho Operations, L.L.C. v. Dir., Div. of Taxation, 21 N.J. Tax 24, 39 (Tax 2003) (quoting Warren A. Seavey, Handbook of the Law of Agency § 10 at 20 (1964)), aff'd, 23 N.J. Tax 167 (App. Div. 2004).

Defendant asserts that the independently owned trucking companies/carriers responsible for transporting plaintiff's customers' freight should be viewed as plaintiff's agents, because they are required to meet certain conditions to transport the freight. Specifically, defendant highlights that the trucking companies/carriers are required to: (i) maintain workers compensation insurance as required by the State where each carrier is domiciled; (ii) the carriers must ensure that "all units [would] be properly pre-cooled as per dispatch instructions and/or as required by load documents"; (iii) the trucking companies/carriers must monitor the temperature of the load while it's in transit; (iv) the carriers must "run their units on [c]ontinuous, and . . . have the units serviced in accordance with manufacturer's guidelines"; (v) the carriers must comply with plaintiff's insurance






requirements; and (vi) the carriers are responsible for maintaining contact with one of plaintiff's dispatch agents.

While these requirements certainly evince a business arrangement between plaintiff and the independently owned trucking companies/carriers, they do not demonstrate or reveal the requisite consent or authority to act on behalf of the other. See Carlson v. Hannah, 6 N.J. 202, 212 (1951) (stating that an agent may only bind a principal for acts that "are within his actual or apparent authority"). "An agency relationship is created 'when one person (a principal) manifests assent to another person (an agent) that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guar. Co., 203, N.J. 208, 220 (2010) (quoting Restatement (Third) of Agency § 1.01 (2006) (internal quotation marks omitted)). As expressed by our Supreme Court, "[c]ritical to the question of agency . . . are the specific role[s] and function[s]" undertaken by the parties. Sears Mortgage Corp., 134 N.J. at 338. Notably, the intentions or written agreements of the parties are not controlling as to whether an agency relationship exists, rather it is the conduct of the parties in their dealings with each other that is germane to establishing an agency relationship. Although direct control over an agent's actions is not pivotal, the court must examine the sum of the parties' interactions to discern whether an agency relationship exists.

Here, defendant has failed to demonstrate that plaintiff consented or otherwise authorized the independently owned trucking companies/carriers to act on plaintiff's behalf. By definition, "[a]n independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the






work." Errickson v. Schwiers Co., 108 N.J.L. 481, 483 (E. & A. 1932). Although plaintiff may have imposed certain contractual requirements on the trucking companies/carriers, as a precondition to them picking up or delivering plaintiff's customers' freight, there is nothing in the motion record establishing that plaintiff exercised control over them or that the trucking companies/carriers acted in a fiduciary manner for plaintiff. The record does not reveal that these carriers were not carrying on independent businesses, or that plaintiff directed or controlled the routes or highways of their travel, that plaintiff dictated the carrier's vehicle size or type, that plaintiff established the carriers work start and stop times, or that the plaintiff imposed any restriction or prohibition on the carriers from transporting freight on behalf of any other shipper. In sum, the court finds that the motion record does not support a finding that the independently owned trucking companies/carriers entered in an agency relationship with plaintiff, or that their actions and conduct demonstrated that they were agents of the plaintiff. Therefore, for purposes of defendant's cross-motion for summary judgment, the court does not find that the independently owned trucking companies/carriers were agents of the plaintiff.

Moreover, because the motion record does not support a finding that the independently owned trucking companies/carriers were agents of plaintiff, the court finds no merit to defendant's argument that plaintiff should be viewed as "doing business" in New Jersey by virtue of using its roadways and relying on its infrastructure. As expressed by our Supreme Court, the validity of the CBT Act "will now be judged, . . . on whether it is a fairly apportioned, non-discriminatory means of requiring such a corporation to pay its just share of the cost of state government upon which it necessarily relies and by which it is furnished protection and benefit." Roadway Express v. Dir., Div. of Taxation, 50 N.J. 471, 491 (1967). Here, an inadequate record exists demonstrating that plaintiff has relied on or made use of the New Jersey highway system. Additionally, as defendant






has not demonstrated that plaintiff has an in-state presence or possesses an ownership interest in the freight being transported, it is unclear how plaintiff derived a benefit from New Jersey's roadway infrastructure or state police.

  B. Other activities

Defendant further urges the court to view plaintiff and its provision of LTL freight consolidation services for its customers, as a business activity being conducted in New Jersey. Moreover, because freight shipments and deliveries were conducted weekly in New Jersey, defendant urges the court to find that plaintiff was doing business in New Jersey.

In response, plaintiff emphasizes that it "has no permanent, physical presence in New Jersey. It does not have any terminals or other offices in New Jersey. It does not employ any drivers or other employees in New Jersey."

As recited above, the court must scrutinize the nature of the tax being imposed and the facts relating to the taxpayer's operations in New Jersey, to discern whether the activities are subject to taxation. See Roadway Express, Inc. 37 N.J. at 140.

Here, the motion record reveals that plaintiff maintains a sales and marketing department with a director of sales and two regional sales representatives. The plaintiff's director of sales apparently works in plaintiff's Texas office, and plaintiff's regional sales representatives work in Georgia and South Carolina. According to plaintiff's COO, the sales representatives are responsible for "maintain[ing] . . . regular contact with the customers in their territory or under their purview." Notably, plaintiff's COO's deposition transcript further reveals that "typically, our regional sales reps do visit their customers and potential customers. . . ." However, the scope, frequency, and extent of these sales and business interactions with plaintiff's customers domiciled in New Jersey, was not divulged. Thus, the court questions whether plaintiff's regional sales






representative engaged in direct solicitation activities or other business activities in New Jersey. As stated by the United States Supreme Court, "'the crucial factor governing nexus is whether the activities performed in [the] state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in [the] state for the sales.'" Tyler Pipe Indus. v. Washington State Dep't of Revenue, 483 U.S. 232, 250 (1987) (quoting Tyler Pipe Indus., Inc. v. Dep't of Revenue, 105 Wn.2d 318, 323 (1986)). Notably, Justice Stevens stated that because Tyler Pipe's "'sales representatives perform[ed] any local activities necessary for maintenance of Tyler Pipe's market and protection of its interests,'" sufficient nexus existed with Washington State for taxation. Id. at 251.

Moreover, during his deposition, plaintiff's COO acknowledged that plaintiff "arrange[d] for the transportation, picking up and delivering [of customer's freight] into Garden State Cold Storage," a cold food storage warehouse having two locations in New Jersey. Additionally, his certification recites that plaintiff "may arrange for goods to be stored in New Jersey on a temporary basis on behalf of its customers in furtherance of its freight forwarding services." However, the motion record fails to disclose the nature of that business arrangement between plaintiff and Garden State Cold Storage. The court questions whether plaintiff is identified as a renter, lessee, licensee, or occupant of that warehouse space. Similarly, does plaintiff exercise some element of dominion or control over the delivery, acceptance, or rejection of that freight for storage at Garden State Cold Storage? Finally, is plaintiff directly liable for remitting payment to Garden State Cold Storage for the storage fees associated with the freight warehousing activities?

Analyzing whether plaintiff's activities satisfy the "doing business" factors or criteria identified under N.J.A.C. 18:7-1.9, the court finds that it does not possess a clear picture of the scope, nature, and extent of plaintiff's and plaintiff's employees in-state business activities.






### III.  Conclusion

Accordingly, for the above stated reasons, the court denies plaintiff's motion for summary judgment and denies defendant's cross-motion for summary judgment.

The court will issue an Order contemporaneously herewith memorializing its conclusions.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




